**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JANE DOE, A SEX TRAFFICKING** | § | |
| **SURVIVOR** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:23-cv-00508** |
| | § | |
| **BACKPAGE.COM, LLC AND** | § | |
| **MICHAEL LACEY;JAMES LARKIN;** | § | |
| **JOHN BRUNST; SCOTT SPEAR** | § | |
| **AND CARL FERRER** | § | |
| *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

COMES NOW PLAINTIFF, Jane Doe, a sex trafficking survivor, and files this, her Original Complaint against Defendants Backpage.com, LLC,  Michael Lacey, James Larkin, John Brunst, Scott Spear, and Carl Ferrer for the below causes of action and would show the Court as follows:

**A.      PARTIES  & SERVICE OF CITATION**

1.    Plaintiff, Jane Doe (hereinafter "Jane Doe" or "Plaintiff") is a natural person and was a resident of Portland, Oregon at the time of the events made the basis of this suit.

2.    Jane Doe is a "victim" as sex trafficking as that term is defined under the TVPA and is therefore protected under the applicable provisions of the Trafficking Victims Protection Reauthorization ACT ("TVPA" herein).

3.    Defendant Backpage.com, LLC ("backpage) is a Delaware Limited Liability Corporation with its principal place of business in Texas. Backpage may be served through its attorney of record, Mark Castillo, 901 Main Street, Suite 6515, Dallas, Texas 75202.

4.    Defendant Michael Lacey, an individual and citizen of the State of Arizona. Lacey may be served with process at 3300 E. Stella Ln., Paradise Valley, Arizona 85253, or wherever he may be found.

5.    Defendant James Larkin, an individual and a citizen of the state of Arizona. Larkin may be served with process by at 5555 CN Case Blanca Drive, Paradise Valley, Arizona 85253, or wherever he may be found.

6.    Defendant John Brunst, an individual and citizen of the State of Arizona. Brunst may be served with process at 4931 E White Gates Drive Phoenix, Arizona, 85018, or wherever he may be found.

7.    Defendant Scott Spear, an individual and citizen of the State of Arizona. Brunst may be served with process at 1225 E Avenida Hermosa, Phoenix, Arizona, 85014-2911, or wherever he may be found.

8.    Defendant Carl Ferrer, an individual and citizen of the State of Texas. Ferrer may be served with process through his attorney of record, Mark Castillo at 901 Main Street, Suite 6515, Dallas, Texas 75202.

9.    Collectively Backpage.com, LLC, Lacey, Larkin, Brunst, Spear, and Ferrer will be referred to herein as the "Backpage Defendants."

## B.    JURISDICTION

10.    This Court has subject matter jurisdiction over the lawsuit because the suit arises under 18 U.S.C. § 1595 of the United States Code. The Backpage Defendants knowingly benefitted financially and by receiving value from participation in a venture which the Backpage Defendants knew or should have known  involved human trafficking and commercial sex

acts, as that term is defined in 18 U.S.C. § 1591. Furthermore, pursuant to 28 U.S.C § 1331 this action involves a federal question under the Trafficking Victims Protection Act and the Trafficking Victims Protection Reauthorization ACT, 18 U.S.C § 1581, et seq.

<strong>C.    VENUE</strong>

11.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(c), because Defendant Backpage's principal place of business is in Dallas County, Texas and Defendant Ferrer is a resident of Dallas County, Texas.

<strong>D.    CONDITIONS PRECEDENT</strong>

12.    All conditions precedent have been performed or have occurred.

<strong>E.    FACTS</strong>

13.    Plaintiff, Jane Doe, brings this suit to recover damages for personal injuries sustained as a child victim of human trafficking and sexual assaults suffered from on or about June through July of 2012.

14.    Jane Doe met Todd Bacchus in New Orleans, when Jane Doe was 17 years old.

15.    Todd Bacchus then took Jane Doe to Houston, Texas.

16.    Bacchus would take Jane Doe to strip clubs and have her stand outside, while Bacchus would arrange appointments for Jane Doe to have sexual intercourse with various "clients."

17.    Bacchus posted ads depicting Jane Doe on the Backpage.com website.

18.    Jane Doe's family saw the posting of Jane Doe on the Backpage.com website.

19.    Jane Doe's mother reported Jane Doe's disappearance to the Federal Bureau of Investigations ("FBI").

20.    Bacchus dropped off Jane Doe to the FBI at a mall in Houston, Texas.

21.    Bacchus later pled guilty to charges of pandering and battery after being arrested in relation to sex trafficking charges.

22.    As a direct and proximate result of these actions, Jane Doe has sustained significant personal injuries and damages.

### F.    BACKGROUND AND GENERAL ALLEGATIONS
### BACKPAGE DEFENDANTS—FACILITATORS OF TRAFFICKING

**a.    BACKPAGE, THROUGH ITS WEBSITE, FACILITATED SEX TRAFFICKING**

23.    According to the United States Department of Homeland Security, human trafficking and sexual exploitation generates billions of dollars each year in illegal proceeds, making it more profitable than any transnational crime except drug trafficking.

24.    While precise data concerning the black-market trade is scarce, it is estimated that in 2013 there were as many as 27 million victims of human trafficking worldwide. Many of these victims come from right here in the State of Texas with hundreds of cases and suspected trafficking victims reported each year.

25.    With the help of online advertising, traffickers can maximize profits, evade law enforcement detection, and maintain control of victims by transporting them quickly between locations.

26.    Online advertising has transformed the commercial sex trade. Sex trafficking used to only take place on the streets, in casinos, at truck stops, and in other physical locations—that is no longer the case. Now, sex trafficking, including the trafficking of Jane Doe, occurs initially online.

27.    Prior to its shutdown, the Backpage.com website was the leading online marketplace for human trafficking.

28.    The National Association of Attorneys General has aptly described the Backpage.com website as a "hub" of "human trafficking."

29.    According to the United States Senate Permanent Subcommittee on Homeland Security and Government Affairs, the Backpage.com website is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children receives from the general public (excluding reports by Backpage itself).

30.    The Backpage Defendants do not deny their site is used for criminal activity, including the sale of vulnerable individuals and children for sex. As found by the United States Subcommittee Report, internal company documents show Backpage's continued acknowledgment of sex trafficking and other illegal activities occurring on their site.

31.    The investigation into Backpage by the United States government resulted in wide sweeping changes. On April 6, 2018, President Trump signed into law the Stop Enabling Sex-Trafficking Act (SESTA), S. 1693 – 115th Congress.

32.    In enacting SESTA, the Senate found that Backpage "knowingly concealed evidence of criminality by systematically editing its 'adult ads' that [it] actually knew facilitated prostitution and child sex trafficking."

33.    The same day as SESTA was enacted, the FBI seized the Backpage.com website, and arrested its founders and owners:



34.    Backpage was not only a forum for abuse—it was an active participant.

**b.    THE BACKPAGE DEFENDANTS KNOWINGLY SANITIZED ADULT ADS TO ALLOW FOR THE SEX TRAFFICKING OF VULNERABLE INDIVIDUALS.**

35.    The Backpage Defendants actively participated in the trafficking and exploitation of vulnerable individuals through systematically editing its adult ads to conceal their true nature—ads to sell people for sex.

36.    More specifically, Backpage altered ads prior to publication by deleting words, phrases, and images indicative of child and other sex trafficking.

37.    Backpage also "educated" its users on how to make illegal ads for prostitution and trafficking appear to be legal ads for "escorts." Backpage has illegally sanitized its site and "educated" its users for nearly a decade.

38.    Originally, in 2008, Backpage began discreetly instructing moderators (who screened ads) to edit the text of adult ads to conceal the true nature of the underlying transaction.

39. Initially, when a user attempted to post an ad with a forbidden word, the user would receive an error message identifying the problematic word choice to "help" the user, as Backpage CEO Carl Ferrer explained it.

40. For example, a user advertising sex with a "teen" would get the error message "sorry, teen is a banned term." By simply redrafting the ad, the user would be permitted to post a sanitized version advertising sex with the same individual.

41. Backpage later employed a similarly helpful error message in its "age verification" process of adult ads. In October 2011, Ferrer directed his technology consultant to create an error message when a user supplied an age under 18 years.

42. The message would appear informing the trafficker that "Oops! Sorry, the ad poster must be over 18 years of age." With a quick adjustment to the poster's age, the ad would post despite the fact that the advertisement still advertised the sexual exploitation and sexual assault of a minor.

43. In December 2009, the Backpage Defendants prepared a training session for their team of moderators on the sanitization process. Through the use of a PowerPoint presentation, moderators were taught that "terms and code words indicating illegal activities require removal of ad or words."

44. Moderators were also informed that the adult moderation pre-posting review queue would be fully implemented by January 1, 2010.

45. Backpage later concluded that the error message method of sanitization alone was no longer efficient. So, instead of relying on their customers to fix ads, Backpage decided to

formalize the sanitization process by creating an automated deletion system—"Strip Term from Ad Filter."

46.    Backpage programmed its electronic filter to delete hundreds of words indicative of sex trafficking from ads before their publication.

47.    In April 2010, in a note Ferrer emailed to himself with the subject line "Adult clean up tasks," Ferrer confirmed that as of April 2010, staff were "moderating ads on a 24/7 basis."

48.    In a section of the note, Ferrer noted that "Ads with bad images or bad test [sic—text] will have the image removed or the offending text removed." In a section titled "Additional Steps," Ferrer said "text" could be cleaned up more as users become more creative.

49.    Ferrer and the Backpage Defendants did not just discuss ways to make the sanitization process more effective, but actively engaged in updating the word bank of terms to make the adult section appear "cleaner than ever."

50.    For example, in a December 1, 2010, email addressed to Backpage moderators and Ferrer, Padilla, Backpage COO, stated:

Between everyone's manual moderations, both in the queue and on the site, and the Strip Term from Ad Filters, things are cleaner than ever in the Adult section.

…

In an effort to strengthen the filters even more and avoid the repetitive task of manually removing the same phrases every day, every moderator starts making a list of phrases you manually remove on a regular basis?

…

Included in your lists should be popular misspellings of previously banned terms that are still slipping by.

…

To avoid unnecessary duplicates, I'm attaching a spreadsheet with the most current list of coded terms set to be stripped out.

51.    The spreadsheet attached to Padilla's email indicates that the following words (among others) were automatically deleted from adult ads by the Strip Term from Ad Filter before ads were published:

- Lolita (and its misspelled variant, lollita)[1]
- Teenage
- Rape
- Young

52.    Moreover, multiple documents and communications from the Backpage Defendants demonstrate the inclusion of these and other terms in the "Strip Term from Ad Filter". Over the course of the next several months, Backpage added additional words to the" Strip Term from Ad Filter", including:

- Amber Alert[2]
- Daddy[3]
- Little girl
- Teen
- Fresh
- Innocent
- School girl

---

[1]    In a November 17, 2011 email, Ferrer told Padilla that the word "lolita' is code for under aged girl.

[2]    In a June 7, 2011 email, Ferrer told a Texas law enforcement official that a word found in one Backpage ad amber alert is "either a horrible marketing ploy or some kind of bizarre new code word for an under aged person." Ferrer told the Texas official that he would forbid the phrase (not remove the advertisements)—without explaining that, inside the Backpage Defendants' operations, this meant the word would be automatically deleted from advertisements to conceal their true nature. Ferrer forwarded this email chain to Padilla and instructed Backpage employees to add "amber alert" to the automatic strip out filter. A June 11, 2012 version of the filter word list indicated that "amber alert" was indeed automatically deleted by the Strip Term from Ad Filter

[3]    In February 2011, CNN ran a story about a 13-year-old girl named Selena who was sold for sex on Backpage. The report noted that "suspect ads with taglines such as 'Daddy's Little Girl' are common" on the Backpage website. Ferrer's remedy instead of removing this content from Backpage was to email the CNN story to Padilla and instruct him to add "daddy" and "little girl" to the strip out filter.

53. For ads submitted to the section advertising escorts for hire, the filter deleted words describing every imaginable sex act. Backpage's filter also deleted common terms of the trade:

- Full Service
- Pay 2 Play
- No limits
- The Erotic Review or TER (a prominent online review site for prostitution)

54. Backpage's filter edited obvious prostitution price lists by deleting any time increments less than an hour (e.g. $50 for 15 minutes).

55. When a user submitted an adult ad containing one of the above forbidden words, the Backpage Defendants' "Strip Term from Ad Filter" would immediately delete the discrete word and the remainder of the ad would be published after moderator review.

56. Of course, the "Strip Term from Ad Filter" changed nothing about the real age of the person being sold for sex or the real nature of the advertised transaction. Nor was it Backpage's intended goal to do so. Quite the opposite.

57. By July 2010, the Backpage Defendants were praising moderation staff for their editing efforts. Ferrer circulated an agenda for a July 2010 meeting of the Backpage Defendants' Phoenix staff and applauded moderators for their work on "adult content" and encouraging Backpage staff to keep up the good work.

58. By August of 2010, Backpage had a staff of 20 moderators working 24/7 to remove any sex act pictures and other code words indicating sex for money.

59. In September of 2010, in response to pressure from Village Voice executives to "get the site as clean as possible," Backpage "empower[ed]" Phoenix-based moderators "to start deleting ads when the violations are extreme and repeated offenses."

60. On September 4, 2010, when Craigslist, the company's chief competitor, shut down its entire adult section, the Backpage Defendants recognized it was "an opportunity" and "[a]lso a time when we need to make sure our content is not illegal due to expected public scrutiny".

61. The Backpage Defendants initially responded by expanding the list of forbidden terms that could trigger the complete deletion of an entire ad—whether by operation of an automated filter or by moderators. Despite finally taking a step in the right direction, the Backpage Defendants soon began to recognize that the deletion of ads with illegal content was bad for business.

62. Ferrer explained his rational that ads should be sanitized instead of deleted to the company's outside technology consultant, DesertNet:

> We are in the process of removing ads and pissing off a lot of users who will migrate elsewhere. I would like to go back to having our moderators remove bad content in a post and then locking the post from being edited.

63. This methodical and calculated decision made by the Backpage Defendants to focus all of its efforts on sanitizing instead of removing advertisements of human trafficking and sexual exploitation was done solely for the Backpage Defendants' own financial gain and with complete disregard for the safety of victims, including Jane Doe.

64. By late 2010, profits were increasing and Backpage was manually or automatically editing 70% to 80% of all adult ads.

65.    By February 2011, Ferrer was boasting that the sanitization system "affects almost every adult ad" on Backpage. Ferrer continued to boast that it was "pretty cool" to see how aggressively Backpage was using the strip out function to conceal the advertisements true purpose—human trafficking and sexual exploitation.

66.    The Backpage Defendants and their executives continually praised the results of this extensive content-editing effort: "[T]he consensus is that we took a big step in the right direction" (by editing instead of deleting illegal advertisements), Ferrer told Backpage executive Padilla, and that the "content looks great" and the Backpage Defendants should keep their goal to "tame the content down even further while keeping good content and users."

67.    Internal emails, as well as the Senate Subcommittee Report, consistently demonstrate that Backpage Defendants and Backpage employees knew the adult section ads were for prostitution and that the moderators knowingly sanitized the ads.

68.    Backpage locked the account of "Urban Pimp" for posting numerous ads for sex. When his ads were temporarily blocked, Urban Pimp complained to the Backpage Defendants that his advertisements for sex were blocked and that he was trying to post advertisements for sex in 50 cities all across the United States.

69.    Rather than report Urban Pimp to law enforcement or ban Urban Pimp from Backpage, Ferrer advised Urban Pimp that he had unlocked his account and that if his account did not work "email me back direct".

70.    As a matter of policy, the Backpage Defendants moreover chose to err against reporting potential child sexual exploitation in favor of retaining its customer base and avoiding law

enforcement review of the Backpage Defendants' actions, placing profits and self-interests ahead of protection our most vulnerable members of society - children.

71.    For example, in June 2012, the Backpage Defendants instructed its outsourced third-party moderators only to delete suspected child-sex advertisements "IF YOU REALLY VERY SURE THE PERSON IS UNDERAGE."

72.    In a similar email, a Backpage supervisor instructed internal moderation staff: "Young ads do not get deleted unless they are clearly a child." Backpage supervisors not only encouraged non-deletion of ads involving the sexual exploitation of minors, but actively instructed moderators not to report advertisements exploiting children to the National Center for Missing and Exploited Children.

73.    For example, in an email exchange dated July 11, 2013, Vaught, a Backpage supervisor, instructed a moderator that she "probably would not have reported" the advertisement despite the fact that the woman in the ad looked drugged, underage, and had bruises. In chastising the moderator for her decision, Vaught noted that "these are the kind of reports the cops question us about" and that while she finds ads "like this" (with clear signs of abuse and trafficking) she does not typically send them to the National Center for Missing and Exploited Children.

74.    Documents from the Backpage Defendants indicate that the company permitted moderators to delete only a *de minimis* share of adult ads in their entirety. In January 2011, Ferrer estimated that about five adult ads were removed out of every 1,000—which equates to less than one percent of advertisements that promote prostitution, as well as human

trafficking and sexual exploitation, being removed from Backpage by the Backpage Defendants.

75.    This low removal rate of advertisements promoting human trafficking and sexual exploitation was by design. For example, on October 24, 2010, Padilla emailed the supervisor of Backpage's contract moderators to inform her of the edit over delete policy. The email subject line read "your crew can edit" and went:

> [Your team] should stop Failing ads and begin editing … as long as your crew is editing and not removing the ad entirely, we shouldn't' upset too many users. Your crew has permission to edit out text violations and images and then approve the ad.

76.    In editing advertisements that clearly advertised sexual exploitation and human trafficking, moderators were instructed by the Backpage Defendants to systematically remove words indicative of criminality before publishing an ad (assuming that the ad still appeared criminal after making it through the Strip Word Filter), in essence concealing and conspiring to promote child prostitution.

77.    As stated by "Backpage Employee A" in the Senate Subcommittee Report who worked as a Backpage moderator from 2009 through 2015, the moderator's goal was to remove key phrases that made the ad sound like a prostitute ad rather than an escort ad, dancing around the legality of the ad. "Backpage Employee A" explained the Backpage Defendants wanted everyone to use the term "escort," even though the individuals placing the ads were clearly prostitutes.

78.    Therefore, the Backpage Defendants were systematically through both explicit and covert means helping their users turn an intended illegal advertisement for human trafficking or

sexual exploitation into a seemingly legal escort advertisement—all while concealing the users' true intent.

79.     Testimony under oath by former Backpage moderator Adam Padilla, brother of Backpage executive Andrew Padilla, corroborates "Backpage Employee A"'s account.

80.     In an August 2, 2016 deposition, Adam Padilla testified that deleting ads for illegal conduct, rather than editing out the indicia of illegality to provide a façade of legality, would have cut into Backpage Defendants' company profits:

> A:  [M]y responsibility was to make the ads okay to run live on the site, because having to get rid of the ad altogether was bad for business. And so you would want to, you know, make it — take out any of the bad stuff in the ad so that it could still run….
>
> Q:  When you say that you viewed your job responsibility to be to take out the bad stuff in ads, you're referring to what we discussed earlier with regard to images that suggested that the ad was advertising money for sex or content that suggested the ad was for an advertisement for money for sex, correct?
>
> A:  That is exactly correct.[203]

> A: [I]t would be pretty much common knowledge that it's still going to run.  So a person is still going to … do what they wanted to do, regardless.
>
> Q: And do you agree with me if you removed language from an ad that blatantly sells—or says that "I'm willing to have sex with you for money," and then you post the remainder, you know as the person who edited the ad, that the ad is someone who is trying to sell sex for money, correct?
>
> A:  Yes.[205]

81.    Not only did the Backpage Defendants prevent moderators from deleting advertisements, but the Backpage Defendants moderators themselves used Backpage for prostitution services. For example, "Backpage Employee C" explained that at least one of her coworkers contacted and visited prostitutes using Backpage ads and told his colleagues about the encounters.

82.    Similarly, "Backpage Employee A" related that some Backpage moderators visited massage parlors that advertised on Backpage. Given the clear company policy and corporate culture of Backpage, those employees who felt that the corporate policy to encourage and assist users to disguise their human trafficking ads were wrong did not voice their concerns out of fear for retaliation.

83.    Although the Backpage Defendants' role in facilitating human trafficking was apparent to its employees, company management reprimanded employees who memorialized this in writing.

84.    On October 8, 2010, Padilla and a Backpage moderator made that point clear by ordering moderators not to leave notes in user accounts, even those who are long time term-of-use violators. Specifically, Padilla states in the October 8, 2010 email:

> Backpage and you in particular, cannot determine if any user on the site in [sic] involved with prostitution. Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. There was not one mention of prostitution in the power point presentation. That was a presentation designed to create a standard for what images are allowed and not allowed on the site. If you need a definition of "prostitution" get a dictionary. Backpage and you are in no position to re-define it.
>
> This isn't open for discussion. If you don't' agree with what I'm saying completely, you need to find another job.

85.     In January 2013, a moderator copied similar notes into an email to a supervisor: "Could not delete ad. An escort ad suggested that they don't want a non GFE so I am assuming they are promote [sic] prostitution".

86.     After an apparent telephone conversation, the moderator wrote the supervisor to "apologize" saying that she had to remove the offending picture and "didn't want to lose the notes." The supervisor suggested that the moderator communicate in "chat" while another supervisor stressed via email that the moderator follow the protocol and not go into detailed explanation.

87.     These practices have continued as recently as August 2016, when Backpage moderation supervisor Vaught requested that contract moderators not use the phrase promoting sex, but should instead say "adult ad."

88.     Despite these admonitions to moderators by the Backpage Defendants, as well as their executives and supervisors, the language of adult ads (both edited and unedited) leave little doubt that the underlying transactions involve human trafficking as well as the sexual exploitation.

89.     For example, in a March 2016 internal email, Backpage moderator supervisors were reminded that the following terms were being wrongfully removed from ads, including: PSE (Porn Star Experience), Porn Star, Full Pleasure, Full Satisfaction, Full Hour, Quickie (even with a price accompanying the term) and GFE—which stands for girlfriend experience—a code word for prostitution.

90.     As explained in an October 10, 2010 Backpage internal email from Padilla to Backpage moderators regarding Backpage's sanitation of adult ads: "it's the language in the ads that

is really killing us with the Attorneys General." Similarly, Ferrer explained the need for a special "Clean Up" of Backpage's adult section in advance of a day on which he expected the "Attorney General investigators to be browsing for escorts."

91.  These behind the scenes companywide policies were not intended to reach the public. On July 28, 2011, Backpage co-founder Larkin cautioned Backpage CEO Ferrer against publicizing the Backpage Defendants' moderation practices, explaining that "we need to stay away from the very idea of editing the posts, as you know."

92.  Backpage had good reason to conceal its editing practices: those practices served to sanitize the content of innumerable advertisements for illegal transactions, including trafficking Jane Doe—even as the Backpage Defendants represented to the public and the courts that it merely hosted content others had created.

93.  Backpage did not implement these sanitation processes on an ad hoc basis but in a systematic manner that demonstrated a clear company policy to aid and abet human traffickers to avoid law enforcement detection while continuing their wholesale sexual assault of vulnerable women and children, including Jane Doe.

   **c.   BACKPAGE'S OWNERSHIP STRUCTURE IS DESIGNED TO HIDE BACKPAGE'S TRUE OWNERSHIP THROUGH THE USE OF SHELL COMPANIES AND A SHAM SALE.**

94.  By 2012, Village Voice Media Holdings changed to Medalist Holdings, Inc., a privately held Delaware entity owned by Lacey, Larkin, Spear, Brunst, and two of Larkin's children.

95.  A February 2015 Agreement and Plan of Recapitalization for Medalist stated that Larkin served as CEO of the company and that Larkin and Lacey retained 42.76% and 45.12% of Medalist shares, respectively.

96.     Brunst, who served as CFO, owned 5.67% of the company and Spear owned 4.09%.

97.     At the time, Medalist was Backpage's ultimate corporate parent—five shell companies removed. Medalist owned Leeward Holdings, which owned Dartmoor Holdings, LLC, which owned IC Holdings, LLC, which owned Backpage.

98.     According to Backpage's tax accountant, Medalist and all its subsidiaries filed a single corporate tax return.

99.     In addition, Backpage had a service agreement with another of Medalist's ultimate subsidiaries, Website Technologies, LLC, under which Website Technologies preformed most of Backpage's outward-facing operations.

100.    Prior to its sale in 2014, below is a chart of Backpage's corporate structure.



---

[4] Medalist Holdings, LLC is now Medalist Holdings, Inc.

### d.    BACKPAGE IS SOLD BUT STILL CONTROLLED BY THE MEDALIST DEFENDANTS.

101.    On December 29, 2014, Medalist entered into a Letter of Intent for the sale of Backpage for $600 million to a Dutch corporation.

102.    The Medalist Holding LLC have long sought to obscure the identity of the purchaser. According to a contemporaneous report in the Dallas Business Journal, the "purchasing company's name was not disclosed, pending regulatory filings in the European Union."

103.    When questioned about the sale in a June 19, 2015 interview, Backpage's General Counsel, Elizabeth McDougall, claimed she had no information about the transaction except that Backpage had been sold to a Dutch entity. McDougall added that she did not even know the name of the new holding company. In fact, the purchaser was McDougall's boss, Ferrer.

104.    The December 2014 Letter of Intent listed the buyer as UGC Tech Group, a Dutch partnership headed by Ferrer. The seller was defendant Camarillo Holdings.

105.    The transaction was styled as a sale of the membership interest in Defendant Dartmoor Holdings, another shell limited liability corporation that owned Backpage, along with Website Technologies, LLC. The signatories on the Letter of Intent were Brunst, named as "CFO" of Camarillo Holdings, and Ferrer, acting as "Director" of UGC Tech Group.

106.    The sale was to be financed with a five-year loan at 7% interest from Camarillo Holdings to UGC Tech Group for the full amount of the $600 million purchase price.

107.    A consulting firm engaged by Medalist concluded, however, that the sale was not an arms-length transaction and instead was infected by self-dealing. Rather than an arms-length

sale, Lacey and Larkin loaned Ferrer, as Backpage CEO, hundreds of millions of dollars in an entirely seller-financed employee buyout.

108.    Under the Letter of Intent, moreover, Lacey and Larkin retained significant financial and operational control over Backpage. The pair, for example, are entitled to amortized loan repayments, earn-outs on future profits, and a 30% participation in any future sale of the company in excess of the purchase price.

109.    Moreover, Larkin and Lacey retained a security interest over all Backpage assets, all membership and stock interest in Backpage, and all Backpage bank accounts.

110.    Furthermore, the Letter of Intent subjects Ferrer to significant restrictions on his management of the company until the loan is repaid. Ferrer cannot sell Backpage, assign the loan to another borrower, or even change accountants or outside counsel without approval from Lacey and Larkin.

111.    The sale was conditional on Ferrer providing a "five-year business plan satisfactory to the Seller in its sole and absolute discretion."

112.    Ferrer also committed to submit to Lacey and Larkin for approval an annual budget, monthly and quarterly balance sheets, and annual audited financial statements. Ferrer also made covenants to give Lacey and Larkin electronic access to Backpage's bank accounts and full access to Backpage's books and records.

113.    In addition, Ferrer could not, without approval, change the company's organizational structure, salaries, banking relationships, or place of domicile.

114.    According to a loan agreement later executed in connection with the sale, Ferrer could not engage in any line of business other than the business engaged in on the date of the sale.

115.    Recent reports confirm the significant level of operations control—as well as financial interest—Lacey and Larkin retain over Backpage.

116.    The declaration supporting the September 2016 California arrest warrants for Lacey, Larkin, and Ferrer, for example, state that "while Ferrer currently runs the day to day operations for Backpage, he and other high-level personnel in Backpage's structure report regularly to Larkin and Lacey.

117.    According to the declaration, Lacey and Larkin also "regularly receive bonuses from Backpage bank accounts. For instance, in September of 2014, Lacey and Larkin each received a $10 million bonus."

118.    Therefore, it is undeniable that, from 2014 – 2015, Lacey and Larkin played a significant role in Backpage actions and continue to have a significant stake in Backpage's operations.

119.    The sale of Backpage (contemplated in the December 29, 2014 Letter of Intent) was executed in a series of transactions on April 22, 2015 for a total purchase price of $603 million.

120.    With the help of a consultant called the Corpag Group, a fiduciary and trust company based in Curacoa, Carl Ferrer created two entities to serve as the direct buyers of Backpage— Atlantische Bedrijven (a partnership that purchased Backpage's U.S. Operations) and UGC Tech Group (a partnership that purchased Backpage's foreign operations).

121.    For the purposes of these transactions, the buyer and borrower was UGC Tech Group, whose sole general partner was CF Holdings, GP a Delaware-based limited liability corporation owned and operated by Ferrer, the managing member.

122.   According to a tax partner at a consulting firm engaged on Backpage-related matters, this unusual structure—involving multiple layers of holding companies, both domestic and foreign—provide no tax benefit to Backpage.

123.   In fact, for tax purposes, all profits within the corporate structure flow up to the U.S. based Amstel River holdings (of which Ferrer is the only member) and all Dutch entities are ignored.

124.   Brunst confirmed in an email to the consulting firm, obtained by the United States Subcommittee investigating the Backpage Defendants' long history of human trafficking, that Atlantisch Bedrijven is subject to United State tax on its earnings and serves as nothing more than a "pass through" entity owned by Ferrer, a United States citizen.

e.   **JANE DOE WAS SEXUALLY EXPLOITED AND TRAFFICKED THROUGH BACKPAGE.**

125.   Jane Doe was sexually exploited through the use of Backpage as Jane Doe's trafficker posted adult ads to the Backpage.com website.

126.   Jane Doe was 17 years of age at the time – a minor.

127.   Jane Doe was forced, by her exploiter, to perform sexual acts upon countless individuals who sought criminal sexual conduct for a fee during June and July of 2012. Jane Doe experienced unspeakable trauma. While she comes before this Court seeking justice for the wrongs committed against her, Backpage Defendants continue to fraudulently conceal the nature of its involvement in Jane Doe's exploitation.

128.   Through Backpage's knowing use of advertisement sanitization techniques, traffickers and sexual assailants were granted unfettered access to exploit and abuse vulnerable

individuals. This deceptive, fraudulent, and criminal practice led to Jane Doe's human trafficking and sexual exploitation where she suffered, as well as continues to suffer, significant personal injuries and damages.

### G.    CAUSES OF ACTIONS AGAINST THE BACKPAGE DEFENDANTS
### COUNT 1: CAUSE OF ACTION– TVPA

129.    The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein.

130.    At all relevant times, Jane Doe was and is a victim with the meaning of 18 U.S.C § 1595(a).

131.    At all relevant times, the Backpage Defendants were and are a perpetrator within the meaning of 18 U.S.C § 1595(a).

132.    The Backpage Defendants benefitted, by receiving financial and other compensation, through participation in a venture involve the trafficking, harboring, and maintenance of human trafficking victims in exchange for financial benefits. 18 U.S.C § § 1590(a), 1591(a)(2), 1593A.

133.    The Backpage Defendants knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of human trafficking victims in exchange for financial benefits, in violation of the TVPA, 18, U.S.C. § 1581, et seq.

134.    The Backpage Defendants' violations were in direct producing, and proximate cause of the injuries and damages to Jane Doe.

### COUNT 2: CAUSE OF ACTION – TEXAS CIVIL PRACTICES AND REMEDIES
### CODE CHAPTER 98

135.    The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein.

136.    The Backpage Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

137.    The Backpage Defendants had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as Jane Doe.

138.    At all relevant times, The Backpage Defendants breached their duty by knowingly participating in the facilitation of trafficking victims, including Jane Doe, by acts and omissions including but not limited to:

   a.    Accepting advertising fees from the Backpage.com website from human traffickers, including Jane Doe's trafficker, despite actual and/or constructive knowledge that those advertisements were for illegal human trafficking, prostitution, and/or sexual exploitation of trafficking victims;

   b.    To aid and abet human trafficking by designing and implementing the Strip Term from Ad Filter to automatically sanitize advertisements intended to promote human trafficking, prostitution, and/or the sexual exploitation of trafficking victims in an effort to maximize advertising revenue, customer satisfaction, and avoid law enforcement detection of illegal acts;

   c.    To aid and abet human trafficking by designing and implementing, in order to maximize revenue, a manual moderation system intended to sanitize posted content advertising human trafficking, prostitution, and/or the sexual exploitation of trafficking victims to give those ads the appearance of promoting legal escort services as opposed to illegal services;

   d.    Implementing a corporate policy to maximize revenue of sanitizing advertisements promoting human trafficking, prostitution, and/or sexual exploitation of trafficking victims instead of removing those advertisements from Backpage website or reporting those advertisements on the proper law enforcement officers;

   e.    Knowingly implementing a corporate policy in order to maximize profit from the adult section of the Backpage website that discouraged moderators and employees of Backpage from contacting the authorities and/or advocacy groups when advertisements on the Backpage website clearly promoted human trafficking, prostitution, and/or sexual exploitation of trafficking victims;

   f.    Knowingly refusing to pull down advertisements (after Backpage had internally sanitized the ad either manually or with the use of the Strip Term from Ad Filter)

that clearly demonstrated trafficking victims were being exploited and trafficked for sex; and

g. Knowingly refusing to pull down advertisements after reports and/or complaints that the advertisement was being used to exploit a trafficking victims

139. The Backpage Defendants received substantial financial benefits as a result of the posting of illegal ads for prostitution on its website

140. The Backpage Defendants received substantial financial benefits as a result of human trafficking on its website.

141. The Backpage Defendants received a direct financial benefit from posting of illegal ads that led to the sexual exploitation of Jane Doe.

142. As described throughout this petition and above, the Backpage Defendants received substantial financial benefits as a result of these acts and/or omissions. Moreover, the Backpage Defendants received a direct financial benefit of the advertising fee paid by Jane Doe's trafficker on the Backpage website, sexually exploiting Jane Doe. These acts, omissions, and/or commissions were producing, but for, and proximate cause of Jane Doe's injuries and damages. Therefore, the Backpage Defendants are in violation of Texas Civil Practice and Remedies Code § 98.002.

## COUNT 3: CAUSE OF ACTION – NEGLIGENCE

143. The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein.

144. The Backpage Defendants had a duty of care to operate the Backpage website in a manner that did not sexually exploit individuals, including Jane Doe.

145.   Moreover, The Backpage Defendants had a duty of care to take reasonable steps to protect the foreseeable victims of the danger created by their online marketplace for prostitution and sex trafficking, and their actions in perpetuating that marketplace by helping sex traffickers sanitize ads to avoid law enforcement detection and post their ads.

146.   The Backpage Defendants breached the foregoing duties because they knew or should have known, that sex traffickers were using their website to post advertisements of trafficking victims for sex, including such advertisements of Jane Doe.

147.   Despite this knowledge, the Backpage Defendants failed to take reasonable steps to protect vulnerable victims being trafficked or exploited, including Jane Doe.

148.   The Backpage Defendants failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

149.   Jane Doe's sexual exploitation was a foreseeable result of Backpage's development of an online sex trafficking community.

150.   As a direct result and proximate result of Backpage Defendants' wrongful acts and omissions, Jane Doe suffered, and continues to suffer severe injuries and damages.

151.   Each of the Backpage Defendants' negligent acts and omissions, singularly or collectively, constituted negligence and proximately caused legal injuries to Jane Doe.

## COUNT 4: CAUSE OF ACTION – NEGLIGENCE *PER SE*

152.   The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein.

153.   The Backpage Defendants' acts and omission violated various provisions of federal law, including the TVPA.

154.   The Backpage Defendants' acts and omissions violated various provisions of Texas law, including but not limited to Texas Civil Practice and Remedies Code Chapter 98.

155.   The Backpage Defendants' failure to comply with the standard of care set forth in these laws constitutes negligence per se.

156.   Each of the Backpage Defendants' negligent acts and omissions, singularly or collectively, constitutes negligence per se and proximately cause legal injuries to Jane Doe.

## COUNT 5: CAUSE OF ACTION – NEGLIGENT UNDERTAKING

157.   The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein.

158.   The Backpage Defendants undertook to perform services that it knew or should have known were necessary for Jane Doe's protection; the Backpage Defendants failed to exercise reasonable care in performing those services; and the Backpage Defendants' conduct increased the Plaintiff's risk of harm.

159.   More specifically, the Backpage Defendants claimed that it undertook efforts to combat the human trafficking and other illegal activities, including but not limited to the trafficking and sexual exploitation of trafficking victims including Jane Doe, that it knew were regularly occurring on its website:

> Backpage prohibits illegal content and activity on its website and takes numbers steps to prevent such misuse, especially to guard against any human trafficking or child exploitation. Backpage has voluntarily employed extensive monitoring to identify improper content, including automated filtering and manual review. It also reports suspect ads to the National center for Missing and Exploited Children ("NCMEC"), and regularly works with local, state, federal law enforcement to support investigations and prosecutions. These actions include promptly responding to subpoenas, providing training to law enforcement, removing and

blocking posts at their request, and even conducting independent research to assist in rescuing victims and the arrest of prosecution of criminals[5].

160.  The efforts identified by the Backpage Defendants are the types that give rise to a duty. There is a duty to exercise reasonable care to avoid a foreseeable risk of injury to others. Here, the Backpage Defendants clearly foresaw the risk of Backpage harming innocent persons, including but limited to trafficking victims like Jane Doe. Likewise, the Backpage Defendants purportedly undertook steps to minimize such risks. Texas law provides for a duty to exercise reasonable care in performing services for another that the individual should recognize as necessary for the protection of a third party. Having recognized the risk to trafficking victims, such as Jane Doe, the Backpage Defendants undertook a duty to protect against the trafficking of persons, including Jane Doe.

### COUNT 6: CAUSE OF ACTION – CIVIL CONSPIRACY[6]

161.  The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein.

162.  Each of the Backpage Defendants entered into a civil conspiracy with one another, Jane Doe's trafficker(s), those who responded to the ads on Backpage.com, and others that ultimately assaulted Jane Doe. The acts of this conspiracy clearly demonstrate the result was to accomplish an unlawful purpose by lawful means, including, but not limited to, promoting prostitute and promoting and assisting human traffickers in promoting sexual

---

[5]  See Brief of Backpage in Response to Motion to Dismiss, BACKPAGE.COM, LLC, Plaintiff v Loretta E. LYNCH in her official capacity of Attorney General of United Stats of American, Defendant., 2016 WL 1575713 (D.D.C).

[6]  While Civil Conspiracy has something been labeled a "derivative tort" in Texas, Jane Doe is pleading it as a separate cause of action out of abundance of caution.

exploitation of trafficking victims, including Jane Doe, and sexually exploiting Jane Doe. The Backpage Defendants had a meeting of the minds with their co-conspirators on the object of the conspiracy – sexually exploiting Jane Doe – and its course of action , and at least one or more conspirators, as alleged herein, committed at least one or more unlawful, over acts to further the object or course of action of the conspiracy.

163. Jane Doe suffered injury and damages as a direct and proximate result of the wrongful act. The civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, were a direct, producing, and proximate cause of the injuries and damages to Jane Doe. The civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, were moreover a substantial factor in bringing about the injury and damages to Jane Doe. Without such civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, the injury and damages would not have occurred. Moreover, a person of ordinary prudence and intelligence in the Backpage Defendants' position would have foreseen that the damages alleged herein might result from the civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged.

164. As co-conspirators, the Backpage Defendants are jointly and severally with one another responsible for the injuries and damages suffered by Jane Doe.

165. As a direct and proximate result of the Backpage Defendants' wrongful acts and omissions, Jane Doe was trafficked and injuries. Jane Doe suffered, and continues to suffer, severe injuries and damages.

## COUNT 7: CAUSE OF ACTION – GROSS NEGLIGENCE

166.   The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein

167.   The Backpage Defendants' acts and Omissions constitute gross neglect.

168.   Viewed objectively from the standpoint of the Backpage Defendants at the time of the incidents, the Backpage Defendants' acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Jane Doe.

169.   The Backpage Defendants nevertheless evidenced conscious indifference and disregard to the rights, safety, or welfare to others, including Jane Doe.

170.   As a result of the Backpage Defendants' gross neglect, Jane Doe was exposed to and did sustain serious and grievous personal injury.

171.   Each of the Backpage Defendants' negligent acts and omissions, singularly or collectively, constituted gross negligence and proximately cause legal injuries to Jane Doe.

172.   Exemplary Damages are Warranted for the Backpage Defendants' gross negligence

## COUNT 8: CAUSE OF ACTION – 18 U.S.C. § 1595

173.   The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein.

174.   Jane Doe is a human trafficking survivor, whom was advertised and sold on Backpage for sexual exploitation.

175.   Backpage was aware that Backpage's website was used for the advertisement and sale of young woman, including Jane Doe, for sexual exploitation.

176.  Despite this knowledge, Backpage refused to take reasonable steps to prevent the trafficking of Jane Doe and other similarly situated young woman.

177.  Backpage profited off of the trafficking of Jane Doe in the form of advertisement payments and continued site usage, which increases advertising sales. Therefore, Backpage is liable as a trafficker under United States Code Chapter 18 §1595.

178.  The actions of Backpage were both the direct and proximate cause of Jane Doe's injuries and damages.

### H.    ACTUAL DAMAGES

179.  The allegations contained in all preceding paragraphs are re-alleged as if fully set forth herein.

180.  Jane Doe is entitled to all legally compensable damages as permitted by Texas and Federal law.  As a producing, direct, and proximate result of the incident, injuries, and damages for which Defendant is liable, Plaintiff seeks and is entitled to general, special, economic, and noneconomic damages, as applicable to each Plaintiff, in an amount in excess of the Court's minimum jurisdictional limits, as the jury determines to be just and fair.  Such damages include, but are not necessarily limited to:

a.      Physical pain sustained in the past;

b.      Physical pain that, in reasonable probability, Plaintiff will sustain in the future;

c.      Mental anguish sustained in the past.

d.      Mental anguish that, in reasonable probability, Plaintiff will sustain in the future;

e.      Loss of earning capacity sustained in the past;

f.      Loss of earning capacity that, in reasonable probability she will sustain in the

future;

g.      Disfigurement sustained in the past;

h.      Disfigurement that, in reasonable probability, Plaintiff will sustain in the future;

i.      Physical impairment sustained in the past;

j.      Physical impairment that, in reasonable probability, Plaintiff will sustain in the future;

k.      Medical care expenses incurred in the past; and

l.      Medical care expenses that, in reasonable probability, s will incur in the future.

## I.      PUNITIVE DAMAGES

181.    Plaintiff's injuries and damages resulted from Defendant's reckless and/or intentional disregard of Plaintiff's rights, which entitles Plaintiff to exemplary damages. Defendant's conduct in the above-described claims reflects complete indifference to the Plaintiff's safety or rights. The Backpage Defendants acted in the face of a perceived risk that their actions would violate Plaintiff's rights under federal law.

## J.      DAMAGES CONSIDERED SEPARATELY

182.    Plaintiff respectfully asserts her request that she be allowed to have the elements of damages considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate her for the injuries, losses, and damages incurred, to be incurred, and that each element of damages be considered separately and individually, segregating the past and future losses, so that the amount of pre-judgment interest due to her may be accurately computed.

## K.    INTEREST AND COSTS

183.    Plaintiff is entitled to an award of attorney fees and costs under 18 U.S.C. §1595 and Tex.

Civ. Prac. & Rem. Chapter 98.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the

Defendants be duly cited to appear and answer herein and that, upon final trial of this cause,

Plaintiff be granted a judgment against Defendants for the following:

a.    Damages as alleged herein and/or proven at trial;

b.    Exemplary damages;

c.    Pre-judgment interest from the date of injury through the date of judgment, at the

maximum rate allowed by law;

d.    Post-judgment interest at the maximum rate allowed by law;

e.    Reasonable attorney's fees, as per 18 U.S.C. § 1595;

f.    Costs of suit; and

g.    Any and all such other and further relief, whether in law or in equity, to which

Plaintiff may be justly entitled.

Respectfully submitted,

**THE CARLSON LAW FIRM, P.C.**
11606 North Interstate Highway 35
Austin, Texas 78753
Telephone:    (512) 346-5688
Facsimile :    (512) 719-4362

By:    /s/ L. Todd Kelly
       L. Todd Kelly
       Texas Bar No. 24035049
       TKellyEFile@carlsonattorneys.com

**ATTORNEY FOR PLAINTIFF**